## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:16-cr-00012-TLS-SLC |
| | ) | |
| ANTONIO CORTEZ HARRIS | ) | |

## REPORT AND RECOMMENDATION

Before the Court is a motion to suppress (DE 19) filed by Defendant Antonio Cortez Harris. Harris seeks to suppress the physical evidence discovered by police officers on February 9, 2016. Harris contends that the officers illegally stopped and searched him without reasonable suspicion based on a description from an anonymous 911 caller. Harris argues that the officers' actions were in violation of his Fourth Amendment rights, and he therefore seeks suppression of the physical evidence obtained by police during the stop and search.

### A. Background

On March 23, 2016, Harris was indicted on a three-count Indictment for: in Count 1, possession of heroin with intent to distribute in violation of 21 U.S.C. § 841(a)(1); in Count 2, possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c); and in Count 3, being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (DE 1). On March 28, 2016, Harris pleaded not guilty. (DE 13). On June 17, 2016, Harris filed the present motion, together with a memorandum in support. (DE 19; DE 20). This matter was referred to the undersigned Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1). (DE 23). An evidentiary hearing on this matter was held on August 11, 2016. (DE 25). On October 12, 2016, Harris filed a post-hearing brief in support of his motion to suppress. (DE 27). The government filed its response on October 24, 2016 (DE

31).  Harris filed his reply brief on November 22, 2016.  (DE 32).  After considering the evidence and argument submitted by the parties in this matter, I RECOMMEND that Harris's motion to suppress be DENIED.

### B. Findings of Fact

At the evidentiary hearing, the government offered the testimony of Officer Ron Partridge of the Fort Wayne Police Department.  Harris did not testify himself or call any witnesses to testify.  The testimony of Officer Partridge was not contested in any meaningful way at the hearing and I FIND his testimony to be entirely credible.

Officer Partridge testified as follows:  On February 9, 2016, he and his partner, Officer Keith Adair, were patrolling the southeast division of Fort Wayne in a marked squad car.  (DE 30, Transcript ("Tr.") 6-7).  At approximately 8:57 a.m., they received a dispatch call for a "party armed," directing them to 3116 Maumee Avenue in Fort Wayne, Indiana.  (Tr. 7).  The dispatch was from a 911 call reporting "a male black wearing a grey jacket armed with a handgun," who was "pacing around and took the gun out, appears mad," and then the 911 caller saw him "put [the] gun back in his right jacket pocket."  (Tr. 9, 29).[1]  At the time the officers received the dispatch, they did not have any information about who had made the 911 call, but they subsequently learned that it was an anonymous caller.  (Tr. 19).  At the time the officers received the radio dispatch, they also received a written dispatch on their in-car computer.[2]  (Tr. 22-23).  The written dispatch provided a phone number for the 911 caller, which was XXX-5703.  (Tr.

---

[1]  The audio recording of the dispatch call and 911 call was submitted into evidence as Government's Exhibit 1.

[2]  The written dispatch log was submitted into evidence as Government's Exhibit 6.

24, 31).

The officers activated the emergency lights and sirens and headed to the address provided by dispatch, which was a hotel called the Deluxe Inn.[3]  (Tr. 9).  They shut down their equipment early, so as not to alert the suspect that they were coming.  (Tr. 9).  They parked around the corner, and then exited the squad car with their weapons at the low ready, given that the call involved an individual potentially armed with a handgun.  (Tr. 9-10).  They walked around the corner and started walking into the parking lot.  (Tr. 10).

As soon as they rounded the corner of the building, they saw Harris, who was the only person in the courtyard, and who matched the description of a black male wearing a grey jacket.  (Tr. 10).  Harris was standing behind the stairwell on a little walkway.  (Tr. 13).  It looked to Officer Partridge that Harris had his hands in his pockets.  (Tr. 14).  For officer safety, the officers began giving him commands, "Police, show us your hands.  Let's see your hands.  Get your hands out of your pockets, walk towards us."  (Tr. 14).  Harris complied with the commands by taking his hands out of his pockets and walking toward the officers.  (Tr. 14).  As Harris was walking toward the officers, Officer Adair asked him if he had any weapons on him.  (Tr. 15).  Harris responded that he had a gun on him.  (Tr. 15).  At that point, Officer Adair began a pat down search for the weapon, while Officer Partridge held Harris's right arm for control.  (Tr. 15).  Officer Adair was patting down Harris's left side initially, and Harris said, "No, no, it's in my right pocket."  (Tr. 16).  Officer Adair retrieved the handgun, a .357 Magnum, Smith and Wesson,  from Harris's pocket, and then Harris was placed in handcuffs.  (Tr. 16, 18).  The

---

[3]  Photographs of the Deluxe Inn taken by Officer Partridge a few days after Harris's arrest were submitted into evidence as Government's Exhibits 2, 3, 4, and 5.

handgun was loaded with six bullets.  (Tr. 18).  Harris admitted that he did not have a handgun permit when Officer Adair asked him.  (Tr. 16-17).

At that point, Harris was under arrest.  (Tr. 17).  The search changed into a search incident to arrest.  (Tr. 17).  During the search, the officers located a Newport cigarette box that contained an off-white substance and some plastic baggies, which was in the outer breast pocket of Harris's jacket.  (Tr. 17).  The officers could see that the lid of the cigarette box was partially open and the baggies were sticking out.  (Tr. 17).  Harris was then transported to the police station for an interview.  (Tr. 18).

### C. Applicable Law

The Fourth Amendment to the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  The Supreme Court has recognized that "[t]he Fourth Amendment permits brief investigative stops . . . when a law enforcement officer has a 'particularized and objective basis for suspecting the particular person stopped of criminal activity.'"  *Navarette v. California*, 134 S. Ct. 1683, 1687 (2014) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)) (citing *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968)).  "The 'reasonable suspicion' necessary to justify such a stop 'is dependent upon both the content of information possessed by police and its degree of reliability.'"  *Id.* (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)).  In determining whether officers have reasonable suspicion, the court must consider the totality of the circumstances; while a "mere hunch" is insufficient, reasonable suspicion requires "considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause."  *Id.* (citations and internal

quotation marks omitted).

While reasonable suspicion may be based on information supplied to police officers by another person and need not be based only on an officer's personal observations, "an anonymous tip *alone* seldom demonstrates the informant's basis of knowledge or veracity." *Id.* at 1688 (quoting *White*, 496 U.S. at 329). "[U]nder appropriate circumstances, an anonymous tip can demonstrate 'sufficient indicia of reliability to provide reasonable suspicion to make an investigatory stop,'" such as where officers corroborate details provided in the tip and where the tipster accurately predicts future behavior such that the tipster has demonstrated "a special familiarity" with the suspect, which implies "that the tipster had 'access to reliable information about that individual's illegal activities.'" *Id.* (quoting *White*, 496 U.S. at 327, 332).

### D. Analysis

Here, Harris argues that the officers illegally stopped and seized him when they approached him where he was standing near the Deluxe Inn with their guns drawn and ordered him to remove his hands from his pockets and walk towards them. Harris contends that the officers did not have reasonable suspicion to stop and seize him based on the anonymous 911 caller's description. Harris argues that the officers did not observe anything that would corroborate the tip that he was armed, and thus they did not have reasonable suspicion that criminal activity was afoot. Harris states that the caller was anonymous in this instance, since the caller did not identify herself. Because the officers did not witness any suspicious behavior, Harris contends that his detention was in violation of the Fourth Amendment. Harris further argues that there was no ongoing emergency exception in this instance, since the caller did not describe any illegal activity or action, as the caller merely reported that the man was carrying a

handgun.

The government, in its response brief, notes that Harris relies largely upon *Florida v. J.L.*, 529 U.S. 266 (2000), a case in which the Supreme Court found that an anonymous tip did not provide officers with reasonable suspicion, where the tipster reported that a black man in a plaid shirt at a bus stop was carrying a gun. The government states that the Supreme Court has since "backed away from this approach," by holding in 2014 that "a detailed, contemporaneous report of suspicious activity to a 911 emergency dispatcher carries with it sufficient indicia of reliability when the details and location of the described events turn out to be correct." (DE 31 at 10 (quoting *Navarette*, 134 S. Ct. at 1689-90)). The government focuses on several points from the Supreme Court's opinion in *Navarette*, namely that the 911 caller reported eyewitness knowledge, which makes the tip more reliable, and that a 911 emergency system has features that allow the identification, tracing, and recording of calls, which provides further indicia of reliability. The government distinguishes the facts of Harris's case from those in *J.L.* and analogizes them to those present in *Navarette*, as the 911 call here was recorded, the caller's phone number was captured by caller ID, the caller provided information about herself, and the caller was reporting an eyewitness account of an ongoing emergency as she witnessed it firsthand.

The government supports its argument that the officers had reasonable suspicion for the stop with discussion of several cases from the United States Seventh Circuit Court of Appeals and one case from this Court. First, the government cites to *United States v. Drake*, 456 F.3d 771 (7th Cir. 2006), in which the Seventh Circuit held that a 911 caller's "contemporaneous eyewitness report of an emergency situation" provided police with reasonable suspicion to stop

the defendant.  *Drake*, 456 F.3d at 774.  The government focuses on this case as the Seventh

Circuit followed case law from other circuits, holding that "[w]e therefore presume the reliability

of an eyewitness 911 call reporting an emergency situation for purposes of establishing

reasonable suspicion . . . ."  *Id.* at 775.  The next case the government discusses is *United States*

*v. Hicks*, 531 F.3d 555 (7th Cir. 2008), in which the Seventh Circuit distinguished the case from

*J.L.*, noting that "[e]very circuit to consider the question, including this one, has distinguished

*J.L.* when the tip is not one of general criminality, but of an ongoing emergency or very recent

criminal activity."  *Hicks*, 531 F.3d at 558-59.  The government next cites to *United States v.*

*Wooden*, 551 F.3d 647 (7th Cir. 2008), in which the Seventh Circuit held that police had

reasonable suspicion to stop and frisk the defendant where an anonymous 911 caller had reported

a black male with a silver handgun, who was wearing a black jacket and blue jean pants, who had

pulled the gun from a holster while arguing with his girlfriend at a specific location.  The

government also discusses *United States v. Shoals*, 478 F.3d 850 (7th Cir. 2007), a case in which

the Seventh Circuit found that officers were justified in patting down the defendant because they

reasonably believed he was armed and dangerous based on a 911 call reporting a man who had

fired a "long gun" matching the defendant's description.  Finally, the government cites to *United*

*States v. Bennett*, No. 1:13-CR-78-TLS, 2014 WL 5390514 (N.D. Ind. Oct. 22, 2014), in which

this Court found that the officers had reasonable suspicion to stop and frisk the defendant based

on a 911 caller's eyewitness account of an ongoing emergency, even though the officers did not

see the defendant exhibit any suspicious behavior.

Harris's reply brief disagrees with the government's statement that in *Navarette,* the

Supreme Court "backed away" from the approach used in *J.L.*, as Harris contends that in all the

other cases cited by the government, other than *J.L.*, the facts involved a caller reporting an ongoing emergency rather than a report of "general criminality."  (DE 32 at 1).  Harris supports his argument with citation to *Alabama v. White*, 496 U.S. 325 (1990), in which the Supreme Court held that officers had reasonable suspicion to justify the stop because their corroboration of details provided by the anonymous tipster made the tip sufficiently reliable.  Because the officers in this case did not have the type of predictive information provided by the anonymous tipster in *White*, Harris contends that the officers did not corroborate any such predictive information, and thus did not have reasonable suspicion for the stop.  As such, Harris "asserts that this case is more like *J.L.* and less like *White* . . . ."  (DE 32 at 4).

In his reply brief, Harris also attempts to distinguish the case law relied upon by the government.  Harris distinguishes *Drake* from the instant case, noting that *Drake* involved an ongoing emergency and did not involve an anonymous caller.  Harris also distinguishes *Hicks* on the same grounds, noting that the case involved an ongoing emergency and the 911 call was not made anonymously.  Although Harris mentions *Wooden* in one sentence describing the very basic facts of the case, he does not attempt to distinguish the case from the instant facts.  Harris does not mention *Shoals* or *Bennett* in his reply brief.  Harris then discusses Judge Hamilton's opinion in *United States v. Williams*, 731 F.3d 678 (7th Cir. 2013), which he states is "instructive," but which he fails to indicate was a dissenting opinion.  (DE 32 at 6).  Harris lastly distinguishes the facts of his case from those in *Navarette*, which he contends involved a 911 caller describing "specific identifiable criminal activity and not generalized activity that may or may not be criminal."  (DE 32 at 8).

Harris's arguments largely challenge the legality of the officers' initial investigatory stop

and detention; he also challenges the officers' frisk of his person, because while he acknowledges that at the point he told Officer Adair that he had a gun, the officers had articulable suspicion that he was armed, he contends that it was "still an open question as to whether he was dangerous." (DE 27 at 7-8). The Court will first address the legality of the investigatory stop, before turning to the legality of the frisk.

## 1. Investigatory Stop

The government argues that reasonable suspicion existed for a *Terry* investigatory stop of Harris. I agree. As discussed above, "[t]he Fourth Amendment permits brief investigative stops . . . when a law enforcement officer has a 'particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Navarette*, 134 S. Ct. at 1687 (quoting *Cortez*, 449 U.S. at 417-18) (citing *Terry* 392 U.S. at 21-22). "When determining if a seizure exceeds the bounds of *Terry*, the court should ask: '(1) whether the police were aware of specific and articulable facts giving rise to reasonable suspicion; and (2) whether the degree of intrusion was reasonably related to the known facts.'" *United States v. Bullock*, 632 F.3d 1004, 1012 (7th Cir. 2011) (quoting *United States v. Tilmon*, 19 F.3d 1221, 1225 (7th Cir. 1994)). The reasonable suspicion standard is objective and based on the totality of the circumstances known to the officer at the time of the stop. *Id.* (citing *Tilmon*, 19 F.3d at 1224; *United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006)). "The officer's subjective motivations for stopping and detaining a suspect are not relevant to the reasonableness inquiry." *Id.* (citing *United States v. Barnett*, 505 F.3d 637, 640 (7th Cir. 2007); *United States v. Van Dreel*, 155 F.3d 902, 905 (7th Cir. 1998)).

The officers' investigation in this case was prompted by a 911 emergency call from an eyewitness. In general, eyewitness accounts of an ongoing emergency "do not need

corroboration, or a history of other accurate reports, to be believed." *Wooden*, 551 F.3d at 649-50; *see also Drake*, 456 F.3d at 775. While Harris has attempted to distinguish the facts of this case from those present in these cases and the cases cited by the government on grounds that there was no ongoing emergency here and the 911 caller here did not provide her name, Harris's arguments are unpersuasive.

The first question to be addressed is whether the 911 caller in this case reported an "ongoing emergency" such that this case is distinguishable from *J.L.*, in which the caller reported only "general criminality." The Northern District of Illinois explained the line drawn between these two categories in *Williams v. Edwards*, No. 10 C 1051, 2012 WL 983788, at *10 (N.D. Ill. March 22, 2012), stating:

> [T]he Seventh Circuit is among a number of courts to have distinguished *J.L.* when the caller reports an ongoing emergency. *See Hicks*, 531 F.3d at 558–59 ("Every circuit to consider the question, including this one, has distinguished *J.L.* when the tip is not one of general criminality, but of an ongoing emergency or very recent criminal activity." (citations omitted)). Recognizing that public safety may be sacrificed if police are required to identify a 911 caller or corroborate the caller's report in all situations, the Seventh Circuit holds that for emergency situations, police are entitled to presume that the report by an eyewitness is reliable. *See United States v. Drake*, 456 F.3d 771, 774–75 (7th Cir. 2006). This presumption is not simply an emergency exception, but is "rooted in the special reliability inherent in reports of ongoing emergencies." *Hicks*, 531 F.3d at 559–60; *see also Wooden*, 551 F.3d at 649 ("[P]eople who report crimes do not invariably claim 'inside information' (as the tipster in *J.L.*... did).... [T]he assertions of eyewitnesses to crime generally do not need corroboration, or a history of other accurate reports, to be believed."). Thus, the Seventh Circuit distinguishes anonymous reports in emergency situations from the report of general criminality presented in *J.L.*, where the call suggested that the defendant possessed a gun illegally, but did not give the police any reason to believe that the defendant intended to use the gun to

commit a crime. *See Hicks*, 531 U.S. at 558–59.

*Edwards*, 2012 WL 983788, at *10. Thus, the difference between the facts of *J.L.*, which involved a report of general criminality—that the defendant had illegal possession of a gun—and the facts of the other cases involving an ongoing emergency was that the tipster in *J.L.* "did not give the police any reason to believe that the defendant intended to use the gun to commit a crime." *Id.*

Here, the 911 caller provided more than a report of general criminality. Unlike in *J.L.*, where the tipster did not explain how he knew that the defendant was carrying a gun, here the caller reported to the 911 dispatcher that she saw the man take the gun out of his pocket and then put it back in his right jacket pocket. (Tr. 29). The 911 caller further told the dispatcher that the man "was pacing around" near her apartment at the Deluxe Inn and "appears mad." (Tr. 29). The 911 call in this instance did not report mere general criminality, as it involved more than just unexplained knowledge that a man was in illegal possession of a handgun at a certain location. Instead, the information reported by the 911 caller was an eyewitness account of an ongoing emergency, because it gave police reason to believe that the defendant may intend to use the gun to commit a crime. The 911 caller saw the man take the handgun out of a pocket and then return it to his coat pocket, and she reported that he was pacing around outside her apartment, and he appeared angry. The 911 caller was reporting a situation near her home about which she was concerned—a man who was pacing outside, who pulled out a handgun, and who appeared angry. These facts rise above the level of general criminality; this was a report of an ongoing emergency. *See Edwards*, 2012 WL 983788, at *11 ("Where there is a basis for suspicion that there may be a shooting, the circumstances suggest an emergency." (citing *Drake*, 456 F.3d at

772)).

The next question is whether the 911 caller in this case was truly anonymous, in line with the tipster in *J.L.*, or whether the 911 caller provided "enough information to identify [her] and [her] location." While the 911 caller here did not provide her name to the 911 operator, the 911 caller did describe her location as being in a room very close to where the defendant was pacing outside at the Deluxe Inn. Furthermore, the 911 caller's phone number was captured by the 911 system's caller ID function.

"A 911 call has some features that allow for identifying and tracing callers, and thus provide some safeguards against making false reports with immunity." *Navarette*, 134 S. Ct. at 1689. Additionally, "911 calls can be recorded, which provides victims with an opportunity to identify the false tipster's voice and subject him to prosecution." *Id.* at 1690. "The 911 system also permits law enforcement to verify important information about the caller," including the caller's phone number and the caller's geographic location. *Id.* Because of these developments in the 911 system, "a reasonable officer could conclude that a false tipster would think twice before using such a system," and thus a "caller's use of the 911 system is therefore one of the relevant circumstances that, taken together, [can justify] reliance on the information reported in the 911 call." *Id.*

Here, the 911 caller provided sufficient information about herself such that police could identify her. She gave information about her location, and the 911 system captured her phone number. Thus, the caller was not truly anonymous as in *J.L.*, and the officers' reliance on the information reported by the 911 caller was justified. *See id*. at 1690.

Accordingly, "*J.L.* does not govern because [the caller] gave the 911 operator enough

information to identify [her] and [her] location, and because [she] reported an ongoing emergency." *Hicks*, 531 F.3d at 560. The officers were justified in relying on the information reported by the 911 caller, and this information gave the officers the necessary reasonable suspicion to stop Harris. Although Harris argues that the officers lacked reasonable suspicion because they did not see him exhibit any suspicious behavior, the officers' reasonable suspicion arose from other key facts; specifically that Harris matched the eyewitness description, he was standing at the location of the reported ongoing emergency outside the Deluxe Inn, and he was identified by the officers within "a matter of minutes" of the 911 call (Tr. 32). *See United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003) (holding that "police observation of an individual, fitting a police dispatch description of a person involved in a disturbance, near in time and geographic location to the disturbance establishes a reasonable suspicion that the individual is the subject of the dispatch"); *see also Wooden*, 551 F.3d at 650 (affirming the district court's finding that an anonymous 911 "report by a person claiming to have seen a gun drawn in public provided articulable suspicion for a *Terry* stop and frisk"). The officers' stop of Harris was therefore justified by reasonable suspicion.

### 2. Frisk

When an individual is stopped by a police officer, the interaction can involve two potential stages: (1) the actual stop itself; and (2) a protective pat-down search. *United States v. Brown*, 232 F.3d 589, 592 (7th Cir. 2000). Such is the case here, where the officers frisked Harris after stopping him. Earlier I determined that the initial stop was justified. Harris argues that even if the initial stop was justified, the pat-down search was not justified because the officers had no information indicating that he was "dangerous," even though he knew he was

"armed" when he told them he had a gun.  (DE 27 at 8).

Whenever the circumstances of an on-the-street encounter are such that a police officer reasonably believes he may be dealing with someone who is armed and dangerous, the officer is justified in conducting a pat-down search of that individual for weapons for his own protection, and for that of others nearby.  *Terry*, 392 U.S. at 27.  "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."  *Id.*  Addressing the objective aspect of the court's analysis, the Seventh Circuit has warned:  "It is important to remember that *we are not limited* to what the stopping officer says or *to evidence of his subjective rationale*; rather, we look to the record as a whole to determine what facts were known to the officer and then consider *whether a reasonable officer in those circumstances* would have been suspicious."  *United States v. Ford*, 333 F.3d 839, 843 (7th Cir. 2003) (citing *Brown*, 232 F.3d at 594).

Here, Officer Partridge testified that during their encounter with Harris, Officer Adair asked Harris if he had any weapons on him, and Harris responded that he had a gun on his person.  (Tr. 15).  The officers then proceeded to perform a pat-down search of Harris for the weapon.  (Tr. 15).  Harris's admission that he had a gun on his person, together with the 911 caller's report (that the man had a gun out, and was pacing around and appeared angry) gave the officers reasonable belief that they may be dealing with someone who is not only armed, but is dangerous.  *See Wooden*, 551 F.3d at 650 (finding "that the circumstances reported to the police [in an anonymous 911 call] implied a need for haste, and that a report by a person claiming to have seen a gun drawn in public provided articulable suspicion for a *Terry* stop and frisk").

14

Accordingly, the officers' pat-down search of Harris was justified by reasonable suspicion that he was armed and dangerous.

### E. Conclusion

For the above reasons, I CONCLUDE that Harris's Fourth Amendment rights were not violated, as both the stop and frisk were justified by reasonable suspicion. I therefore RECOMMEND that Harris's motion to suppress (DE 19) be DENIED.

The Clerk is directed to send a copy of this Report and Recommendation to counsel for the parties. NOTICE IS HEREBY GIVEN that within 14 days after being served with a copy of this recommended disposition, a party may serve and file specific, written objections to the proposed findings and recommendations. Fed. R. Crim. P. 59(b)(2). FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.

Dated this 22nd day of December 2016.

/s/ Susan Collins
Susan Collins,
United States Magistrate Judge